# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

ASPHALT PAVING SYSTEMS, INC.,

        Plaintiff,

vs.                                    Case No.  3:18-cv-255-J-34JBT

SOUTHERN STATES PAVEMENT
MARKINGS, INC. and MERCHANTS BONDING
COMPANY (MUTUAL),

        Defendants.

_____/

## O R D E R

**THIS CAUSE** is before the Court on Defendants' Southern States Pavement Markings, Inc. (Southern States) and Merchants Bonding Company (Mutual) (Merchants) (Defendants) Dispositive Motion for Summary Judgment (Doc. 24; Motion) filed on February 11, 2019.  On February 21, 2018, Plaintiff Asphalt Paving Systems (Asphalt Paving), filed an Amended Complaint against Defendants alleging claims of breach of contract, unjust enrichment, and breach of bond.  See Doc. 4 (Amended Complaint).  The Defendants subsequently filed the instant Motion.[1]  In response to the Motion, Asphalt Paving filed its Memorandum in Opposition to Defendants' Motion for Summary Judgment on March 8, 2019.  See Doc. 29 (Response).[2]  With leave of the Court, Southern States

---

[1] In support of the Motion, Defendants attached a variety of documents.  See Doc. 24-1 (Carter Affidavit); Doc. 24-2 (Bond Contract); 24-3 (Kreis Deposition); Doc. 24-4 (Supplemental Agreement); Doc. 24-5 (Subcontract).

[2] In support of its Response, Asphalt Paving attached a variety of documents.  See Doc. 29-1 (Donald Affidavit); Doc. 29-2 (Supplemental Agreement Duplicate); Doc. 29-3 (Subcontract Duplicate); Doc. 29-4 (FDOT/Anderson Agreement); Doc. 29-5 (Kreis Deposition Additions).  In citing to the Kreis Deposition or the Kreis Deposition Additions, the Court will use the page numbers assigned by the Court's CM/ECF docketing system.

filed a Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment on March 21, 2019.  <u>See</u> Doc. 32 (Reply).

Accordingly, the matter is ripe for review.

## I.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[3]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d

---

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

<u>Id.</u>  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  <u>Campbell v. Shinseki</u>, 546 Fed. Appx. 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.  In citing to <u>Campbell</u>, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority."  <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  <u>Anderson</u>, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II.    Background and Arguments of the Parties[4]

This case arises out of a contract dispute between Asphalt Paving and Southern States for remedial work Asphalt Paving completed in repairing a nearly six mile length

---

[4] The facts recited in this section are either undisputed, or any disagreement has been indicated.  Because this case is before the Court on Defendants' Motion, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to Asphalt Paving.  <u>See</u> <u>T-Mobile S. LLC v. City of Jacksonville, Fla.</u>, 564 F.Supp.2d 1337, 1340 (M.D. Fla. 2008).

of roadway rumble stripes.[5]  Rumble stripes are "essentially divots carved into a roadway that cause a vehicle to bump and vibrate to alert a driver if he/she is drifting off the road." Carter Affidavit at ¶ 5.

Southern States initially entered into a contract with the Florida Department of Transportation (FDOT) to install rumble stripes on a portion of Florida roadway.  Id. at ¶ 9; Supplemental Agreement at 1.  Pursuant to the contract between Southern States and FDOT, identified as E3P89, Southern States was to install the rumble stripes in a skip array pattern, rather than in a continuous array pattern.  Carter Affidavit at ¶¶ 8-10; Donald Affidavit at ¶ 4; Supplemental Agreement at 1, 2;  Subcontract at 1.  A skip array pattern "consists of cutting divots continuously in a roadway for a specific length, then skipping a specific length of roadway, and then cutting divots again for a specific length of roadway; thereby creating a 'gap' between the rumble stripes . . . ."  Carter Affidavit at ¶ 8. Conversely, a continuous array pattern "consists of cutting divots in a roadway continuously for a specific length of road . . . ." Id. at ¶ 7.  Here, FDOT contracted with Southern States to install a skip array pattern of seven feet of divots followed by five feet of paved roadway, repeating that pattern for approximately six gross miles.  Carter Affidavit at ¶ 11; Donald Affidavit at ¶ 4.  As a condition of the FDOT contract, Southern States obtained a bond from Merchants.  See Bond Contract.  The bond was to cover "payment to all persons furnishing labor, material, equipment, and supplies" which derived "directly or indirectly from the prosecution of the work provided for in the Contract."  Bond Contract at 1.

---

[5] The parties use the terms "rumble stripe" and "rumble strip" interchangeably throughout their filings.  For the sake of consistency, the Court will use the term "rumble stripe" in this Order, unless directly quoting from a contract, affidavit, or deposition testimony which uses the alternative term.

In performing its work, Southern States cut the divots too deeply and therefore entered into a Supplemental Agreement with FDOT to repair its faulty work. Carter Affidavit at ¶¶ 12, 14; Donald Affidavit at ¶¶ 5-6; Supplemental Agreement at 1-2. The Supplemental Agreement between Southern States and the FDOT was identified as Financial Project #40716695225, and also referred to the original E3P89 contract between the two. Supplemental Agreement at 1. The Supplemental Agreement stated that Southern States "shall, at [its] sole expense, repair existing rumble striping initially installed by [Southern States, and] . . . shall perform the Repair Work in accordance with the [contract specification] 'Micro Surfacing for Rumble Striping', attached hereto as Attachment 'A.'" Id. at 2. That specification, titled "Description," required Southern States to

> [c]onstruct a micro surfacing mixture for placement into [the] rumble striping depressions with the type of mixture specified in the Contract Documents. Micro surfacing is a mixture of polymer-modified emulsified asphalt, mineral aggregate, mineral filler, water, and other additives, properly proportioned, mixed and spread on a paved surface.

Id. at 4. The Supplemental Agreement further stated that Southern States was to "[f]ill in the rumble stripe depressions completely in one pass so that when the micro surfacing material is cured, the material will be flush with the surface of the surrounding pavement but no more than 1/8" higher than the surface of the pavement surrounding the rumble stripe." Id. at 9. With regard to the type of equipment Southern States could use to complete the work, the Supplemental Agreement specifically stated that it was acceptable for Southern States to use a "self-loading continuous machine[]" for the micro surfacing process. Id. at 8. It also set forth requirements for acceptable "self-loading continuous

machines." Id.  More particularly, any type of self-loading continuous machine had to be

a

> continuous-flow mixing unit able to accurately deliver and proportion the mix
> components through a revolving multi-blade, double-shafted mixer and to
> discharge the mixed product on a continuous-flow basis. . . .  Self-loading
> continuous machines shall be capable of loading materials while continuing
> to lay micro surfacing, thereby minimizing construction joints.  Self-loading
> continuous machines shall be equipped to allow the operator to have full
> control of the forward and reverse speeds during applications of the micro
> surfacing material and shall be equipped with opposite-side driver stations
> to assist in alignment.

Id.

Under a heading titled "Method of Measurement," the Supplemental Agreement

provided that "the quantity to be paid for micro surfacing filling edgeline rumble stripe will

be the length, in miles, completed and accepted. . . .  The quantity to be paid for micro

surfacing filling of centerline rumble striping will be the length, in miles, completed and

accepted."  Id. at 10.  Finally, under the heading "Basis of Payment," the Supplemental

Agreement indicated that payment for the "[m]icro surfacing filling of edgeline rumble

striping" and "[m]icro surfacing filling of centerline rumble striping" would be "per mile."

Id. at 11.

In order to fulfill the terms of its Supplemental Agreement with FDOT, Southern

States entered into a subcontract with Asphalt Paving.  See generally Subcontract; Carter

Affidavit at ¶ 17; Donald Affidavit at ¶ 7.  The Subcontract specifically referenced the

original E3P89 agreement between FDOT and Southern States, as well as the

Supplemental Agreement numbered 40716695225.  Subcontract at 1.  The Subcontract

identified FDOT as the Prime Contractor and Principal, Southern States as the

Contractor, and Asphalt Paving as the Subcontractor.  Id.  The Subcontract incorporated

the terms of the previous agreements between FDOT and Southern States and directed that Asphalt Paving was to

> perform all labor required for the completion of the said work in accordance with all provisions of the original contract and of the specifications and plans referred to therein . . . and under the direction and to the satisfaction of the Principal's engineer or other authorized representative in charge of said work.

Id. Under a heading titled "Basis and scope of payment," the Subcontract further stated that "[p]ayment will be made to the SUBCONTRACTOR for work actually performed and completed, as measured and certified to by the PRINCIPAL'S Engineer, at the unit prices hereinafter specified . . . ." Id. at 2. Finally, the Subcontract provided that FDOT, as the prime contractor, would determine and verify the amount of work completed by Asphalt Paving. Id. at 4. In this regard, the Subcontract included a chart setting forth a description of the work to be performed by Asphalt Paving, units of measurement, estimated quantity of work, price per unit, and overall estimated cost. Id. The relevant chart is reproduced below.

| Item No | Description | Unit | Quantity | Price | Extended |
|---------|-------------|------|----------|-------|----------|
| | Micro Surfacing for Rumble Strips | LF | 20,000+/- | $ 5.00 | $ 100,000.00 |
| | | | | | |
| | Subcontract Approximate Value | | | | $100,000.00+- |

Id. The chart describes Asphalt Paving's work as "Micro Surfacing for Rumble Strips" measured in linear feet, with the expectation that the work will include approximately 20,000 feet, paid at a rate of $5 per foot. Id. The chart further reflects that the parties expected that the approximate value of the Subcontract would be $100,000. Id.; see also Carter Affidavit at ¶ 18; Donald Affidavit at ¶ 8.

Asphalt Paving performed its work, with Southern States' knowledge, using a "continuous pull." Donald Affidavit at ¶ 11. In this regard, Asphalt Paving notes that

> [a] continuous pull spreads material along the length of the road, including but not limited to, rumble stripes. The continuous pull method allows for a consistent surface, which is both safer and better aesthetically and also takes less time as there is no stopping and starting. When using the continuous pull method, the Industry Standard is that payment is made up for the entire length of road.

Id. at ¶¶ 12-14. As a matter of example, and in support of its opposition to Defendants' Motion, Asphalt Paving presented information from a contract between FDOT and a separate company regarding micro surface repair work. There, the company was paid for the entire length of road, rather than for the sum of the distance for "each individual rumble stripe." Id. at ¶ 15-19. Moreover, Asphalt Paving asserts that it "has done dozens of rumble stripe repairs in varying states over four decades and has always been paid by the length of road." Id. at ¶ 20.

When Asphalt Paving completed its work, it sought payment in the amount of $150,215 from Southern States. Donald Affidavit at ¶ 28. This amount represented micro surfacing of 30,043 linear feet, and included the "total linear feet of the roadway . . . ." Carter Affidavit at ¶ 19.[6] However, Southern States has only paid Asphalt Paving $87,000 for its work having calculated the length of road work as 17,400 linear feet because it included the length of the seven foot divot areas, but excluded the five foot portions of paved roadway between the seven foot divot sections. Carter Affidavit at ¶¶ 20-22; Donald Affidavit at ¶ 29. Because Asphalt Paving micro surfaced the total length of road,

---

[6] The parties differ somewhat in the distances they report regarding the total length of road micro surfaced by Asphalt Paving, as well as the contract price demanded by the same. As noted above, Asphalt Paving alleges it micro surfaced a total of 30,043 linear feet, and therefore was due $150,215. Donald Affidavit at ¶ 28. Conversely, Southern States suggests that Asphalt Paving micro surfaced a total of 29,828 linear feet, and sought $149,140 in payment from Southern States. Carter Affidavit at ¶ 19.

it asserts that Southern States' payment of $87,000 leaves a "remaining balance of $63,215" owed to Asphalt Paving for its work on the project. Donald Affidavit at ¶¶ 28-29. Asphalt Paving provided notice on several different occasions to Southern States, FDOT, as well as Merchants, of its belief that it was still owed the outstanding balance on the contract. Amended Complaint at ¶¶ 15-18.

Frank Kreis, an FDOT engineer who "provid[ed] technical assistance and monitor[ed] . . . the repair work" performed by Asphalt Paving, stated in his deposition that he did not know how often repair projects like the one at issue in this case occurred, and was only aware of three such projects, including the one involving Southern States and Asphalt Paving. Kreis Deposition at 6, 7-8. He did not know whether those other projects involved continuous array rumble stripes or skip array rumble stripes. Id. at 8. As to the Subcontract between Southern States and Asphalt Paving, Kreis did not know if anyone asked FDOT "to measure and certify the repair work done by Asphalt Paving." Kreis Deposition Additions at 6. Likewise, if FDOT had been asked to do so, Kreis did not know whether the FDOT engineer would have only "measured the quantities that were . . . filled with the micro surfacing" and would have otherwise excluded the paved five foot strips between the seven foot sections of divots. Id. He nonetheless affirmed his belief that "the only work needed to be done [under the Subcontract] was to fill [in the] 7-foot pattern of cuts." Kreis Deposition at 10.

Kreis further testified that his role did not include "contract administration" for FDOT, and FDOT was not responsible for paying Asphalt Paving. Kreis Deposition Additions at 8; Donald Affidavit at ¶ 25. Accordingly, Kreis stated that if he had engaged in any measuring or review of the project, he would not have done so for the purposes of

determining payment to Asphalt Paving. Kreis Deposition Additions at 8. Kreis nonetheless stated that if he had been "asked to certify the [Asphalt Paving] repair work as the FDOT engineer," he would have measured only "[t]he 7 feet that needed micro surfacing," and not "the 5 feet that didn't need any micro surfacing . . . ." Id. at 7.

As a result of only being paid for a portion of the work it performed, Asphalt Paving filed the instant action alleging claims of breach of contract (Count I) and unjust enrichment (Count II) against Southern States, and a breach of bond claim (Count III) against Merchants. See Amended Complaint.[7] In their Motion, Defendants argue that the plain language of the Subcontract establishes that Southern States was only obliged to pay Asphalt Paving for micro surfacing the seven foot segments of divots, and not the five foot paved portions in between the cut portions. Motion at 6-7. Defendants also contend that the Subcontract required the measurement method to be determined by FDOT, and FDOT employee Kreis stated that he would have only certified payment for the seven foot segments of roadway. As such, Defendants assert that Southern Paving paid Asphalt Paving what was due, and therefore did not breach the contract. Id. at 6-7.

---

[7] The Court exercises diversity jurisdiction over this matter. See 28 U.S.C. § 1332. Asphalt Paving is a New Jersey corporation where it also has its principal place of business. Amended Complaint at ¶ 1. Defendant Southern States is a Florida corporation with its principal place of business in Florida. Id. at ¶ 2. Finally, Merchants is incorporated in Iowa, and has its principal place of business there. Id. at ¶ 3. At the time Asphalt Paving filed its Amended Complaint, the stated amount in controversy was $75,215, as Southern States had only paid Asphalt Paving $75,000 for its work. Amended Complaint at ¶ 14. However, Southern States eventually paid another $12,000 to Asphalt Paving, totaling $87,000, leaving an alleged balance of $63,215. Doc. 11 at ¶ 4 (Answer); Motion at 5; Response at 10. Therefore, this Court exercises diversity jurisdiction over this action. See 28 U.S.C. § 1332; PTA-FLA, Inc. v. ZTE USA, Inc., 844 F.3d 1299, 1306 (11th Cir. 2016) ("diversity jurisdiction is determined at the time of filing the complaint . . . ."). In diversity actions, the Court applies substantive law of the forum state. See Keller v. Miami Herald, Pub. Co., 778 F.2d 711, 714 (11th Cir. 1985) (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)); Allstate Ins. Co. v. Clohessy, 32 F. Supp. 2d 1328, 1330 (M.D. Fla. 1998). As such, Florida law governs the resolution of Asphalt Paving's claims.

As to Asphalt Paving's claim for unjust enrichment, Defendants argue that this claim fails because an express contract existed between the parties regarding Asphalt Paving's performance and Southern States' payment for the micro surfacing work. Id. at 7. Finally, because Defendants contend that Asphalt Paving's claims for breach of contract and unjust enrichment are not viable, Defendants assert there is no basis for Asphalt Paving to argue that Merchants breached the bond agreement. Id. at 8. Accordingly, Defendants request the Court to enter summary judgment in its favor. Id. at 8-9.

In the Response, addressing the breach of contract claim, Asphalt Paving argues that the terms of the parties' contract are ambiguous and subject to parol evidence, therefore raising genuine issues of material fact that preclude summary judgment. Response at 10-14. In regard to its unjust enrichment claim, Asphalt Paving contends that it raised this claim in the alternative to its breach of contract claim, because where additional work is requested and completed above and beyond the terms of an existing contract, a claim for unjust enrichment may exist. Id. at 14-15. Finally, Asphalt Paving argues that Merchants is not entitled to summary judgment on Asphalt Paving's breach of bond claim because Southern States may be obligated to pay Asphalt Paving for the outstanding five foot portions of roadway it micro surfaced, whether under a theory of breach of contract or unjust enrichment. Id. at 15.

In the Reply, Southern States generally argues that the parties' contractual language unambiguously provides that measurement for the remedial work will be governed by FDOT's chosen method, and that Asphalt Paving took no action to exclude this language from the Subcontract. Reply at 1-4. It further suggests that Southern

States "is not in breach of the [parties' Subcontract] as [Asphalt Paving] is not yet entitled to payment because the FDOT has not yet measured and certified the repair work . . . ." Id. at 4. Additionally, and in reply to Asphalt Paving's unjust enrichment arguments, Defendants note that Southern States did not request that Asphalt Paving perform the additional work of micro surfacing the five foot strips of roadway, nor did Defendants benefit from this work in any way. Id. at 4-5. As such, Southern States reiterates that the Court should grant summary judgment in its favor.

## III. Discussion

### A. Count I – Breach of Contract

In moving for summary judgment on Asphalt Paving's breach of contract claim, Defendants argue that Southern States was only obliged to pay Asphalt Paving for the micro surfacing it completed for the seven foot sections of roadway with divots, and not the five foot roadway between the cut portions of road. Motion at 6-7; Reply at 1-2, 4. In particular, Defendants assert that the Subcontract's language indicating that payment will be made based on the measurement and certification of FDOT's Engineer, Subcontract at 2, constitutes a type of dispute resolution mechanism. Reply at 1-3. Defendants further argue that this provision requires that Asphalt Paving accept Kreis' determination that if he had been asked to measure and certify the micro surfacing performed by Asphalt Paving, he would have measured and certified only the work for the seven foot strips of cut roadway. Motion at 6-7. According to Defendants, Asphalt Paving is therefore contractually obliged to accept Kreis' proffered measurement which corresponds with the amount Southern States paid to Asphalt Paving. Alternatively, Defendants suggest that

because FDOT "has not yet measured and certified the repair work," there is no breach of contract because Asphalt Paving is not yet entitled to payment. Reply at 4.

In response, Asphalt Paving argues that the Subcontract's measurement term of "linear feet" is ambiguous, in that it does not clarify what is being measured – the total length of road or only the seven foot portions of divots. Response at 6, 11-12. As such, Asphalt Paving contends that extrinsic evidence is necessary to determine the intention of the parties regarding what will be measured for the purposes of compensation for the work performed pursuant to the Subcontract. Id. at 12. Because extrinsic evidence is necessary to determine the terms of the contract, Asphalt Paving asserts that genuine issues of material fact exist thereby precluding summary judgment in favor of Defendants. Id. at 11, 14.

Under Florida law, "'a phrase in a contract is "ambiguous" only when it is of uncertain meaning, and may be fairly understood in more ways than one.'" Solymar Inv. Ltd. v. Banco Santander S.A., 672 F.3d 981, 991 (11th Cir. 2012) (quoting Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So. 2d 1000, 1002 (Fla. 2d DCA 1995) (quotation marks and internal citations omitted)). However, just because parties may differ on the interpretation of a contract's terms, does not immediately render the agreement ambiguous. F.W.F., Inc. v. Detroit Diesel Corp., 494 F. Supp. 2d 1342, 1357 (S.D. Fla. 2007). Rather, it is for the court to decide as a matter of law whether a contract is ambiguous. Id.

While determining whether a contract is ambiguous is a question of law, see F.W.F., Inc., 494 F. Supp. 2d at 1357, interpreting an ambiguous contract can present a question of law for the court or a question of fact depending on whether the ambiguity is

patent or latent.  See Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa., 734 F. Supp. 2d 1304, 1314-15 (S.D. Fla. 2010).  A patent ambiguity is one that "appears on the face of the document and may not be resolved by the consideration of parol evidence." Id. at 659 (citation omitted); see also DaCosta v. Gen. Guar. Ins. Co. of Fla., 226 So. 2d 104, 105, 107 (Fla. 1969).  Accordingly, the proper interpretation of a contract with a patent ambiguity is a question of law to be resolved by the Court on summary judgment. Escobar v. United Auto. Ins. Co., 898 So. 2d 952, 954–55 (Fla. 3d DCA 2005) (per curiam).  A patent ambiguity, however, exists only where "a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to ordinary rules of construction."  Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co., 711 So. 2d 1135, 1138 (Fla. 1998) (internal quotation and citation omitted).  See also  MDS (Canada) Inc. v. Rad Source Techs., Inc., 720 F.3d 833, 844 (11th Cir. 2013) ("A patent ambiguity arises from defective, obscure, or insensible language, and Florida law does not permit the introduction of extrinsic evidence to discern the parties' intentions." (internal citations and quotations omitted)).

A latent ambiguity, on the other hand, "arises 'where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings.'"  Mac-Gray Servs., Inc. v. Savannah Assocs. of Sarasota, LLC, 915 So. 2d 657, 659 (Fla. 2d DCA 2005) (citation omitted); see also  MDS (Canada) Inc., 720 F.3d at 844 ("A latent ambiguity is said to exist where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings.").  Importantly, the

interpretation of a contract with a latent ambiguity requires the court to consider parol evidence and would preclude entry of summary judgment. Id. at 659-660; see also City of Clearwater v. BayEsplanade.com, LLC, 251 So. 3d 249, 254, n.3 (Fla. 2d DCA 2018) ("[w]hen an agreement contains a latent ambiguity[,] . . . the issue of the correct interpretation of the agreement is an issue of fact which precludes summary judgment.") (quoting Barrington v. Gryphon Invs., Inc., 32 So. 3d 668, 671 (Fla. 2d DCA 2010) (alterations in original)); Nationstar Mortgage Co. v. Levine, 216 So. 3d 711, 716 (Fla. 4th DCA 2017) (same); LSQ Funding Group, L.C. v. EDS Field Services, 879 F. Supp. 2d 1320, 1332 (M.D. Fla. 2012) ("A latent ambiguity creates a question of fact regarding the correct interpretation of the agreement.").

Here, the parties disagree as to the meaning of the term "linear feet" in the Subcontract. Defendants contend that the term "linear feet" is meant to include only the seven foot cut portions of roadway. Motion at 3-5. Conversely, Asphalt Paving contends that the term "linear feet" is meant to include the entire length of road it was hired to repair. Response at 3, 6, 10-13. The Court determines that the term "linear feet," which is ordinarily a term that is clear and readily understood, is ambiguous in the context of the Subcontract between Southern States and Asphalt Paving, and as such, extrinsic evidence is required to determine its meaning. Thus, summary judgment in favor of Southern States is inappropriate as to Asphalt Paving's breach of contract claim.

On its face, the term "linear feet," is "clear and intelligible and suggests but a single meaning," here that Southern States will compensate Asphalt Paving for its work as measured in linear feet. Mac-Gray Servs., Inc., 915 So. 2d at 659–60. However, what cannot be determined from the plain language of the contract, and requires extrinsic

evidence to resolve, is <u>what</u> is being measured in linear feet – the entire roadway, or only the seven foot portions of road with divots?   Likewise, the Subcontract states that Southern States will pay Asphalt Paving by the linear foot for "Microsurfacing for Rumble Strips."   Subcontract at 4.   The contract documents are also ambiguous as to whether "rumble strips/rumble stripes" only include the specific cut portions of roadway, and not the space between the cuts, or conversely include the entire length of road as measured in gross on which the cuts are made.   Nothing in either the Supplemental Agreement or the Subcontract answers these questions.

In reaching this conclusion, the Court rejects Defendants' argument that the language appearing in the Subcontract's "Basis and scope of payment" section, and stating that "[p]ayment will be made . . . as measured and certified to by the PRINCIPAL's Engineer, at the unit prices herein specified," Subcontract at 2, serves as a dispute resolution mechanism.  Motion at 6-7; Reply at 1-3.  Defendants contend that pursuant to this language, the amount that Southern States paid Asphalt Paving is justified because Kreis, an FDOT engineer, suggested - after the fact - that he would have measured only the seven foot cut strips of micro surfaced roadway.   Motion at 6-7; Reply at 1-3. However, neither the Subcontract language on which Defendants rely, nor the arguments they construct in relation to that language, support their position that no genuine issue of material fact exists as to Asphalt Paving's breach of contract claim.

Defendants are generally correct in noting that it is not uncommon for contracting parties to agree that a third party will arbitrate or otherwise resolve disputes between them.  Reply at 3 (citing <u>Auchter Co. v. Zagloul</u>, 949 So. 2d 1189, 1192 (Fla. 1st DCA 2007) (contract between owner and builder included clause directing that resolution of

claims and disputes would initially be referred to architect before being subject to arbitration or mediation); Aberdeen Golf & Country Club v. Bliss Const., Inc., 932 So. 2d 235, 238 (Fla. 4th DCA 2005) (contract between owner and general contractor contained alternative dispute resolution clause requiring a decision by the architect before the claim would be addressed in arbitration, mediation, or litigation); and Prestige Protective Corp. v. Burns Int'l Security Servs. Corp., 776 So. 2d 311, 313-14 (parties can contract to enter into binding arbitration)). However, Defendants' suggestion that the "Basis and scope of payment" section of the Subcontract constitutes such a dispute resolution clause is belied by its plain meaning, as well as other language within the contract. See Key v. Allstate Ins. Co., 90 F.3d 1546, 1548-49 (11th Cir. 1996) ("Under ordinary principles of contract interpretation, a court must first examine the natural and plain meaning of a [contract's] language."); CJ's Sales & Serv. of Ocala, Inc. v. Howard, No. 5:18-cv-194-Oc-30PRL, 2018 WL 7287161, at *2 (M.D. Fla. Oct. 10, 2018) ("When determining the intent of the parties, courts must look to the plain language of the contract and construe the contract as a whole." (internal citation and quotation omitted)); Guarisma v. Microsoft Corp., 209 F. Supp. 3d 1261, 1267 (S.D. Fla. 2016) ("Florida courts construe contracts according to their plain language."); Merco Group at Akoya, Inc. v. Gen. Computer Servs., Inc., 237 So. 3d 1052, 1056-57 (Fla. 3d DCA 2017) (court will construe contract as a whole); Wheeler v. Wheeler, Erwin & Fountain, P.A., 964 So. 2d 745, 751 (Fla. 1st DCA 2007) ("We are, of course, obliged to construe contract provisions according to their plain and ordinary meaning unless the agreement specifically provides for a different meaning.").

Preliminarily, the Court notes that the language relied upon by Defendants appears in a section of the Subcontract titled "Basis and scope of payment." Subcontract at 2.

This portion of the Subcontract provides that Asphalt Paving was to be paid for the work it performed "as measured and certified to by [FDOT's] Engineer, at the unit prices hereinafter specified . . . ." Id. Other portions of the Subcontract also specify that Asphalt Paving was to be paid for its work at a rate of five dollars per linear foot, as measured and certified by a FDOT engineer. Id. at 2, 4.

Importantly, immediately preceding the "Basis and scope of payment" section upon which Defendants rely, is a section specifically titled "Settlement of controversies." Subcontract at 2. This section states

> the SUBCONTRACTOR agrees that if any controversy arises between SUBCONTRACTOR or the CONTRACTOR and the PRINCIPAL in respect to the amount, quantity, kind, classifications, price or value of the work performed or to be performed by the SUBCONTRACTOR, or in respect to the kind, character, condition, suitability, utility, price or value of any materials or supplies furnished or to be furnished by the SUBCONTRACTOR, or the proper interpretation of the plans, specifications, or original contract, or in respect to any alleged delay or delays in the prosecution or completion of the work made or caused to be made by the PRINCIPAL, or in respect to any kind of labor or manner of performance thereof, or in respect to any other matter or thing pertaining to or connected with the work provided for herein, the CONTRACTOR may, in its discretion, compromise and settle the same with the Principal, and to tender to the SUBCONTRACTOR of the amount due or to become due to him under and according to said compromise and settlement shall operate to release the CONTACTOR, PRIME CONTRACTOR and PRINCIPAL and their property and the structure or structures or other works, covered by the original contract, and the whole thereof, and the surety of the CONTRACTOR from liability to the SUBCONTRACTOR for any sum of money or damages in excess of the amount tendered.

Subcontract at 2. Next to this language in the margin of the Subcontract is the notation "With Sub-contractor Approval," and signed with the initials of Asphalt Paving's President. Id. This portion of the Subcontract provides that should a controversy arise between Asphalt Paving and FDOT, or Southern States and FDOT, regarding Asphalt Paving's work on the project, Southern States may, with Asphalt Paving's approval, enter into a

compromise or settlement with FDOT, thereafter paying Asphalt Paving according to the terms of the settlement.  Id.  Any such payment would then release FDOT, Southern States, and Mutual (as surety), from further liability.  Id.  As such, in this section of the Subcontract, the parties anticipated how they would address and settle controversies that might arise between the FDOT and either Southern States or Asphalt Paving, and labeled that section as such.  The parties did not include in this section of the Subcontract any provision addressing how they would resolve a dispute between Southern States and Asphalt Paving.

It strains reason to read the "Settlement of controversies" and "Basis and scope of payment" sections of the Subcontract together as requiring a conclusion that the parties intended the "Basis and scope of payment" language relied upon by Southern States to constitute a binding resolution clause.  If the parties wanted a dispute resolution clause, they would have included it in the "Settlement of controversies" portion of the Subcontract. Here, it is apparent that the "Basis and scope of payment" subsection simply directs who should measure and certify Asphalt Paving's work for payment purposes.  That section does not support Defendants' contention that the Subcontract contains a dispute resolution mechanism requiring Asphalt Paving to accept Kreis' after the fact supposition that Asphalt Paving should be paid only for micro surfacing the seven foot cut portions of roadway.[8]

---

[8] Defendants also fleetingly suggest that Southern States "is not in breach of the [parties'] Contract as [Asphalt Paving] is not yet entitled to payment because the FDOT has not yet measured and certified the repair work."  Reply at 4.  In doing so, Defendants appear to assert that FDOT's measurement and certification served as a condition precedent to triggering Southern States' duty to pay Asphalt Paving.  See also Answer at 2-3.    However, they present no further factual discussion or argument supporting this conclusory statement. A "litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point." SSH2 Acquisitions, Inc. v. Howard, No. 10-61703-CIV, 2012 WL 668042, at *3 (S.D. Fla. Feb. 29, 2012) (citing and quoting Phillips v. Hillcrest Med. Ctr., 244 F.3d 790, 800 (10th Cir. 2001)).  Notably,

Moreover, Kreis admitted in his deposition that because his role as an FDOT engineer did not include "contract administration," if he had been asked to measure Asphalt Paving's work, that measurement would not have been for contract payment purposes. Kreis Deposition Additions at 8. He also testified that he did not know what measurement approach an engineer measuring the project on behalf of FDOT would have employed to determine the extent of micro surfacing warranting payment. Id. at 6. Nonetheless, when asked to speculate how he would measure the work by Asphalt Paving, Kreis indicated he would limit his measurement to the seven foot strips of cut roadway. Id. at 7. Certainly, the "Basis and scope of payment" portion of the Subcontract states that any payment to Asphalt Paving should be "measured and certified by the [FDOT] engineer." Subcontract at 2. However, the plain meaning of this language does not stretch so far to permit Southern States' interpretation that after Southern States paid Asphalt Paving, it could then call upon Kreis to determine that the amount Southern States paid was sufficient, where Kreis readily acknowledged his job did not include measuring Asphalt Paving's work for payment purposes.

Returning to the plain language of the Subcontract, the parties agreed that Asphalt Paving's work would be measured and certified "at the unit prices" specified in the Subcontract. Subcontract at 2. The parties identified the unit price as five dollars per linear foot, and the extent of work to be measured as "Micro Surfacing for Rumble Strips." Id. at 2, 4. What remains ambiguous is whether the linear foot price covers the micro surfacing for the entire length of the road (i.e., the 30,043 feet of road as argued by

---

by paying Asphalt Paving the amount Southern States determined it owed, even if eventually disputed by Asphalt Paving, it appears Southern States waived the satisfaction of any such condition precedent.

Asphalt Paving) or only the seven foot cut portions (i.e., the 17,400 feet of road, as argued by Southern States).

Asphalt Paving suggests that extrinsic evidence would aid in determining the meaning of the otherwise ambiguous language in the Subcontract. Response at 11-12. In this regard, Asphalt Paving references industry standards which it contend would establish that when a contractor uses a continuous pull machine, as Asphalt Paving did here and as was specifically contemplated in the Supplemental Agreement, the work to be measured and paid for includes the entire length of road. Id. Asphalt Paving also asserts that in at least one other contract entered into by FDOT the unit measurement of "linear feet" included the entire length of micro surfaced road, rather than merely the sum of the seven foot portions of cut road. Id.

Given the Court's determination that the Subcontract's use of the term "linear feet" as the unit of measurement for payment for Asphalt Paving's work creates a latent ambiguity, summary judgment is inappropriate as to Asphalt Paving's breach of contract claim. See Mac-Gray Servs., Inc., 915 So. 2d at 659-60 (noting that the existence of a latent ambiguity precludes entry of summary judgment); see also City of Clearwater, 251 So. 3d at 254, n.3; Nationstar Mortgage Co., 216 So. 3d at 716; LSQ Funding Group, L.C., 879 F. Supp. 2d at 1332. Thus, summary judgment is due to be denied as to Count I of Asphalt Paving's Amended Complaint.

## B.  Count II – Unjust Enrichment

Defendants also seek summary judgment on Asphalt Paving's claim of unjust enrichment. They generally assert that because an express contract exists between the parties, the quasi-contract claim of unjust enrichment is unavailable to Asphalt Paving.

Motion at 7 (citing Diamond "S" Dev. Corp. v. Mercantile Bank, 989 So. 2d 696, 679 (Fla. 1st DCA 2008)). In response, Asphalt Paving asserts that it is entitled to plead unjust enrichment in the alternative, and that where a "contract exists and additional work is requested and completed, the law 'implies an obligation to pay the reasonable costs thereof . . . .'" Response at 14 (quoting Davis v. Dep't of Health & Rehab. Servs., 461 So. 2d 210, 212 (Fla. 1st DCA 1984)). The undisputed record before the Court demonstrates that summary judgment is due to be entered in favor of Southern States on this claim.

A claim for unjust enrichment under Florida law requires proof of the following essential elements: "(1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." United Techs. Corp. v. Mazer, 556 F.3d 1260, 1270 (11th Cir. 2009) (quoting Rollins Inc. v. Butland, 951 So. 2d 860, 876 (Fla. 2d DCA 2006)). However, an unjust enrichment claim is equitable in nature, and thus, not available when there is an adequate legal remedy. See Bowleg v. Bowe, 502 So. 2d 71, 72 (Fla. 3d DCA 1987) (per curiam).

The Court recognizes that breach of contract and unjust enrichment claims may be pled in the alternative. Donnelly v. Circuit City Stores, Inc., No. 5:06–cv–387–Oc–10GRJ, 2007 WL 896337, at *3 (M.D. Fla. Mar. 22, 2007). In this context, Asphalt Paving argues its claim for unjust enrichment is viable because, in the context of the existing contract between itself and Southern States, Southern States requested that Asphalt Paving perform extra work, Asphalt Paving did so, and therefore Southern States is

obliged to pay Asphalt Paving for its additional work. Response at 14. In support of this argument, Asphalt Paving cites to Davis, 461 So. 2d at 212. Davis, however, does not support Asphalt Paving's position.

In Davis, the court ruled that a claim for unjust enrichment could proceed in the face of an existing contract, where "changes or alterations are requested" by one of the parties. Id. at 212. In such an instance, the "law does imply an obligation to pay the reasonable costs" of the performing party. Id. (citations and quotations omitted). However, the facts of Davis are distinguishable from the instant case.

In Davis, a contractor submitted a bid to perform utility services for a building. Id. at 211. During the pre-bid conference, the building owner stated that services would only be required for a set period of hours each week. Id. However, after the contractor entered into the agreement, the owner insisted that it interpreted the terms of the agreement as obligating the contractor to provide more extensive services, which the contractor did subsequently provide. Id. Despite this, the owner refused to provide the contractor additional compensation for its work. Id. In evaluating the unjust enrichment claim alleged by the contractor, the court ruled that under a theory of unjust enrichment, even if a contract existed between the parties, if the facts developed at trial suggested that the contract's terms only included the more limited service hours, then the building owner would be obliged to pay the contractor for the additional services it requested and was provided. Id. at 212. As such, Davis stands for the proposition that if, despite the terms of a contract, one party asks the other to perform additional tasks, and the other party does so, then the requesting party is obliged to pay the performing party for its additional work.

Davis is inapposite to the present controversy. In the instant action, the parties disagree as to the underlying terms of their agreement and whether the Subcontract binds Southern States to compensate Asphalt Paving for micro surfacing the five foot strips of paved road between the seven foot portions of cut road. The parties are not arguing that Southern States asked Asphalt Paving to perform additional duties beyond the scope of what the parties articulated in their contract. The conflict between Southern States and Asphalt Paving focuses on the meaning of the Subcontract's terms, rather than on whether Asphalt Paving performed additional duties at the request of Southern States, and is now due compensation. Therefore, the facts of Davis, and its ruling regarding unjust enrichment claims, does not help Asphalt Paving.

Moreover, even if Asphalt Paving could have pled an unjust enrichment claim in the alternative to its breach of contract claim, that is not what Asphalt Paving did in this case. Asphalt Paving's unjust enrichment claim relies on the factual predicate common to all its claims. See Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc., 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005) ("The Defendants' quasi contract claim is predicated on the same set of allegations supporting their claims under FUTSA and FDUTPA. Accordingly, because an adequate remedy exists at law, the Defendants have not stated a claim upon which relief may be granted for breach of contract implied in law (quasi contract, quantum meruit, or unjust enrichment)."). That common factual predicate alleges an express contractual relationship between Asphalt Paving and Southern States. See generally Amended Complaint at ¶¶ 8, 24. Indeed, the allegations specific to Asphalt Paving's unjust enrichment claim allege that Asphalt Paving "entered into a subcontract . . . with [Southern States] to perform microsurfacing on roads" located in Florida. Id. at ¶

8. Thus, Asphalt Paving's unjust enrichment claim is predicated on Southern States' failure to perform <u>pursuant to</u> the Subcontract.

Moreover, nowhere in its Amended Complaint or subsequent filings before the Court does Asphalt Paving allege that it lacks an adequate remedy at law to address the dispute between itself and Defendants. As such, Asphalt Paving's claim for unjust enrichment fails because an adequate remedy exists at law, in that Asphalt Paving can, and indeed is, pursuing a breach of contract claim in Count I. <u>See</u> <u>Bowleg</u>, 502 So. 2d at 72; <u>see</u> <u>also</u> <u>Kraft Co., Inc. v. J & H Marsh & McLennan of Fla., Inc.</u>, No. 2:06–CV–6–FtM–29DNF, 2006 WL 1876995, at *3 (M.D. Fla. July 5, 2006) ("Count IV alleges a claim for unjust enrichment based upon money paid to defendant pursuant to the contract . . . . Here, it is undisputed that Kraft and Marsh entered into a contract in which Marsh agreed to provide insurance brokerage services, including insurance procurement, administration of the policies, and claims resolution. The Court finds that a claim for unjust enrichment is unavailable to Kraft because of the existence of a legal remedy."). Accordingly, summary judgment is due to be entered on behalf of Southern States as to Count II of the Amended Complaint.

### C. Count III – Breach of Bond

Finally, Merchants seeks summary judgment on Asphalt Paving's breach of bond claim, arguing that "[s]ince [Southern States] has no liability pursuant to the [parties' Subcontract], Merchants [as surety] can have no liability to [Asphalt Paving] pursuant to the Bond." Motion at 8. In response, Asphalt Paving contends that if the "court determines that . . . the Subcontract is ambiguous . . . then Merchant's [sic] is not entitled to summary judgment on [Asphalt Paving's] Breach of Bond Claim." Response at 15.

Here, summary judgment is due to be denied as to the Breach of Bond claim against Merchants.

Florida law is well settled that "the liability of a surety is coextensive with that of the principal." First Sealord Sur., Inc. v. Suffolk Const. Co., Inc., 995 So. 2d 609, 610 (Fla. 3d DCA 2008). Given the Court's conclusion that the Subcontract between Southern States and Asphalt Paving is ambiguous, the Court is unable to determine what liability, if any, may extend to Merchants, as surety to Southern States. As such, summary judgment in Merchants favor is inappropriate as to Count III of the Amended Complaint.

In light of the foregoing, it is **ORDERED:**

Defendants' Southern States Pavement Markings, Inc. and Merchants Bonding Company (Mutual) Dispositive Motion for Summary Judgment (Doc. 24) is **GRANTED in part** and **DENIED in part**.

**A.** The Motion is **GRANTED** to the extent Southern States Pavement Markings, Inc. seeks summary judgment in its favor on Count II of the Amended Complaint.

**B.** In all other respects, Defendants' Motion is **DENIED**.

**C.** Entry of final judgment is deferred until after final resolution of this case.

**DONE AND ORDERED** in Jacksonville, Florida this 13th day of August, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc26

Copies to:

Counsel of Record